**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

```
CURTIS Y. POMPEY,               )
                                )
               Plaintiff,       )
                                )
          v.                    )        1:09CV1006
                                )
LEGGETT & PLATT, INCORPORATED,  )
                                )
               Defendant.       )
```

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This case comes before the undersigned United States Magistrate Judge for a recommended ruling on Defendant's Motion for Summary Judgment (Docket Entry 20). (See Docket Entry dated Dec. 2, 2010; Fed. R. Civ. P. 72(b)(1).) For reasons that follow, said Motion should be granted.

PROCEDURAL HISTORY

Plaintiff filed a Complaint in this Court alleging that Defendant, his former employer,[1] "is liable to [him]":

1) under Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981 ("Section 1981") for "subjecting him to race discrimination, hostile work environment and disparate treatment due to race in the terms and conditions of his employment" (Docket Entry 1 at 6);

2) under Title VII, Section 1981, and N.C. Gen. Stat. § 143-422.2 for "wrongful[ly] terminati[ng] [his employment] due to race discrimination" (id.); and

_____

[1] The Complaint alleges and Defendant's Answer agrees that Defendant is a corporation based in Missouri and that Defendant previously employed Plaintiff in North Carolina. (Docket Entry 1 at 2-3; Docket Entry 6 at 7-8.)

3) under North Carolina state law "for the Negligent Supervision and Retention of [Robert Sawyer, a former employee of Defendant, with whom Plaintiff had an altercation at work]" (id.).

In his deposition, Plaintiff clarified that he claimed race discrimination due to the existence of a hostile work environment and in connection with his firing, but that he did not allege "[a]ny other incident that . . . was negative for [him] that was based upon [his] race in this lawsuit[.]" (Docket Entry 21, Ex. A at 72-73.) After the completion of discovery, Defendant moved for summary judgment. (Docket Entry 20.) In support of said Motion, Defendant filed a brief (Docket Entry 21), to which it attached:

A) a transcript of Plaintiff's deposition from April 27, 2010 (id., Ex. A);

B) an affidavit from Joseph Navarro, a regional Vice President of Operations for Defendant, who worked at the same facility as did Plaintiff (id., Ex. B);

C) an affidavit from Kenneth Campbell, Defendant's Plant Manager for said facility (id., Ex. C); and

D) an affidavit from Belinda Clark, Defendant's Human Resources Manager for said facility (id., Ex. D).

Plaintiff responded in opposition (Docket Entry 22) and contemporaneously filed therewith:

A) an affidavit from Plaintiff dated November 4, 2010 (Docket Entry 26) and print-outs from CourtSearch.com regarding Sawyer (Docket Entries 26-1, 26-2);

B) a copy of an "Employee Disciplinary Report Form" from 2007 which documented Plaintiff's provision of an "Oral Warning" to Sawyer for "Absenteeism" (Docket Entry 23);

C) a copy of an "Employment Separation Form" dated March 28, 2008, documenting Defendant's placement of Plaintiff on "one week disciplinary leave with pay" on March 24, 2008 (Docket Entry 24);

D) unsworn written statements from Edward Smith and Sheneda Love about their observations of the altercation between Sawyer and Plaintiff (Docket Entry 25); and

E) Defendant's responses to Plaintiff's Interrogatories, Requests for Admissions, and Requests for Production of Documents (Docket Entry 27).

Defendant filed a reply (Docket Entry 31), along with a supplemental affidavit of Vice President Navarro (Docket Entry 32).

<u>FACTUAL BACKGROUND</u>[2]

Plaintiff – who, in his deposition, described himself as "black" (Docket Entry 21, Ex. A at 36) – began working for Defendant in 1981. (<u>Id.</u>, Ex. A. at 23-25, Ex. B at 3.)[3] From 1997 until his firing in March 2008, Plaintiff served as a Production Supervisor overseeing the assembling, painting, and packing of bed

_____

[2] As set out in the Discussion section, <u>infra</u>, p. 16, at this stage, the Court must view the record evidence in the light most favorable to Plaintiff.

[3] The transcript of Plaintiff's deposition contains a typographical error reflecting 1991, rather than 1981, as the year in which Plaintiff's employment with Defendant commenced (<u>see</u> Docket Entry 21, Ex. A at 24); the surrounding testimony (<u>see</u> <u>id.</u>, Ex. A at 23-25) and other evidence (<u>id.</u>, Ex. B at 3) confirm the correct year as 1981. The parties agree on this point. (<u>Compare</u> Docket Entry 22 at 1 <u>with</u> Docket Entry 21 at 2.)

frames and rails at Defendant's facility in Lexington, North Carolina. (Id., Ex. A at 26, 28-30.) He reported to Plant Manager Campbell, who reported to Vice President Navarro. (Id., Ex. A at 31.)[4] While working as a Production Supervisor, Plaintiff received positive annual evaluations and, as a result, annual raises. (Id., Ex. A at 96.) At the time of Plaintiff's discharge, Defendant had an Employee Handbook of which Plaintiff had knowledge (including as to its portions prohibiting and providing for the reporting of race-based, work-place harassment and authorizing discipline – up to dismissal – of employees who fought on company property). (Id., Ex. A at 44-46 and Dep. Exs. 3, 4.)

<u>Racially Hostile Work Environment</u>

In August 2007, Plaintiff had an argument with another Production Supervisor, Kay Swing, over access to some equipment. (Id., Ex. A at 30, 73-76.) During the dispute, Plaintiff "was a little loud, so [Swing] went to [Plant Manager Campbell]." (Id. at 74.) As a result, Campbell, Swing, and Plaintiff had a joint meeting. (Id., Ex. A at 75.) Swing "claimed that [Plaintiff] cursed her"; Plaintiff had not cursed at Swing and told Campbell so. (Id., Ex. A at 76.) In addition, Plaintiff stated that he was "tired of [Swing] calling [him] boy." (Id.)[5] Prior to that

---

[4] Campbell became Plant Manager in 1998. (Docket Entry 21, Ex. C at 1-2.) Prior to Campbell's arrival, Navarro served as Plant Manager. (Id., Ex. A at 26.) Navarro came to the Lexington facility in 1994. (Id., Ex. B at 2.)

[5] During his deposition, Plaintiff clarified that Swing <u>twice</u> had "used that term with respect to [him.]" (Docket Entry 21, Ex. A at 77.) "[The] [f]irst time [Plaintiff] th[ought] [Swing] was joking. She was just laughing
(continued...)

report, Campbell "was not aware of" Swing's use of that term and "was shocked at the time." (Id.)[6]  Swing denied Plaintiff's accusation, but apologized nonetheless.  (Id., Ex. A at 77.) Plaintiff did not "hear that [term] from [Swing] anymore after the meeting"; nor "did she refer to [Plaintiff] in any way that [he] found offensive after that meeting took place[.]"  (Id.)

During Plaintiff's deposition, Defendant's counsel asked Plaintiff to identify "any other basis for [his] claim of harassment" and Plaintiff answered:  "Well, I was constantly subject to black jokes." (Id., Ex. A at 80.)  Plaintiff then cited an occasion, during a "supervisors' trip" away from the plant in March or April 2007, when (while Plaintiff and his co-workers were "drinking") two of Plaintiff's co-workers, John Gillespie and Charles Reid, used the term "black bees and stuff like that in a joking manner, but to [Plaintiff] it wasn't a joke." (Id., Ex. A

---

[5](...continued)
about it.  Th[e] other time she was not laughing.  She just made the statement out there."  (Id., Ex. A at 79.)  Specifically, when Plaintiff "made a joke with [other employees]," Swing said "Boy, you need to quit or something of that nature."  (Id.)  In his subsequent affidavit, Plaintiff materially altered this account by stating that Swing "persistently referred to [him] as 'boy' in approximately September 2007" and that, "[f]or months prior to that, she referred to [him] as a 'boy' . . . ."  (Docket Entry 26 at 3 (emphasis added).)  In resolving Defendant's instant Motion, the Court need not accept as true Plaintiff's contradiction by affidavit of his prior deposition testimony.  See, e.g., Erwin v. United States, 591 F.3d 313, 325 n.7 (4th Cir. 2010); Hernandez v. Trawler Miss Vertie Mae, Inc., 187 F.3d 432, 438 (4th Cir. 1999).

[6] In a later affidavit, Plaintiff contradicted his deposition testimony in this regard by asserting that Campbell "was aware of these instances of [Swing referring to Plaintiff as "boy," persistently in September 2007, as well as on occasions in prior months,] but he condoned it . . . ."  (Docket Entry 26 at 4.)  In resolving Defendant's instant Motion, the Court need not accept as true Plaintiff's contradiction by affidavit of his prior deposition testimony.  See, e.g., Erwin, 591 F.3d at 325 n.7; Hernandez, 187 F.3d at 438.

at 80-81, 87-88.)  When questioned about the meaning of the term "black bees," Plaintiff stated:  "If you want me to say it, I'll say it.  They're calling me a black bastard."  (Id., Ex. A at 81.)[7] Plaintiff did not report that incident to anyone because he had known "these guys for years, and [he] really wasn't trying to hurt [them]."  (Id., Ex. A at 81-82.)

Plaintiff further asserted that, during supervisory-level meetings at the facility, "sometimes [there were] black jokes told in there."  (Id., Ex. A at 83.)  He could provide no examples. (Id., Ex. A at 86.)  These jokes occurred "about at least every other month," either during a "six-month period" beginning around March or April 2007 or throughout all of 2007.  (Id., Ex. A at 86-88.)[8]  As to "[w]ho told the black jokes," Plaintiff initially stated:  "Well, usually, one of my fellow supervisors would tell a joke, a black joke."  (Id., Ex. A at 83.)  He then said:  "Well, Charlie, Mike, all of them would make jokes like that."  (Id.)[9] Again, Plaintiff did not "complain to anybody about it," because

---

[7] This clarification suggests that "black bees" likely should have been transcribed as "black b's."

[8] Plaintiff gave a materially different report in the affidavit he later filed in opposition to Defendant's summary judgment motion; specifically, Plaintiff expanded the period in which he heard "racial jokes" in work-place meetings from part or all of 2007 to "2007 and 2008" and increased the frequency of such occurrences from "about at least every other month" to "approximately twice per week."  (Docket Entry 26 at 4.)   In resolving Defendant's instant Motion, the Court need not accept as true Plaintiff's contradiction by affidavit of his prior deposition testimony.  See, e.g., Erwin, 591 F.3d at 325 n.7; Hernandez, 187 F.3d at 438.

[9] Plaintiff clarified that, by "Charlie" and "Mike," he meant Charlie Reid and Mike Ferguson.  (Docket Entry 21 at 86.)

"these guys [he] considered friends. And [he] really didn't want to hurt these guys. [He had] know[n] these guys for years and years and years." (Id., Ex. A at 83-84.)[10]

When asked if he "ever hear[d] [Vice President] Navarro make a racist joke or anything like that," Plaintiff responded: "Yes." (Id., Ex. A at 94.) As to what he heard, Plaintiff stated only: "I just heard him say the bad – I'm not sure exact [sic] the word verbatim but about some black." (Id.) In response to a request for a more specific description, Plaintiff demurred, because it had "been so long [since he] heard it." (Id.) More specifically, Navarro made the remark in question "[t]hree or four years before [Plaintiff] w[as] terminated[.]" (Id.) Further inquiry as to the "context" of Navarro's complained-of comment led Plaintiff to testify only that "it was like a joke in one of those meetings that we was [sic] in." (Id.) Plaintiff could remember only one such utterance by Navarro. (Id., Ex. A at 95.)

Toward the end of the initial round of deposition questioning by Defendant's counsel, Plaintiff had a chance to describe "anything else that [he] th[ought] w[as] relevant to [his] claims"; he took that opportunity to assert that he had failed to report the jokes made in meetings because "there wasn't anyone in there [he] th[ought] [he] could trust to tell" and because he "didn't think anything would get done." (Id., Ex. A at 115.) Defendant's

---

[10] Even when Plaintiff complained to Plant Manager Campbell about Production Supervisor Swing's use of the word "boy," Plaintiff did not mention anything about such jokes, because he "didn't really want to point fingers at these fellows." (Docket Entry 21, Ex. A at 84.)

counsel then confronted Plaintiff with the fact that Defendant's anti-harassment policy did not require Plaintiff to report his concerns to persons at his facility, but instead gave him "the option of calling [Defendant's] Corporate Personnel Office in Missouri[.]" (Id., Ex. A at 115-16.) Plaintiff nonetheless maintained that he "didn't feel like anything would get done," but conceded that, at the time those events occurred, he "[n]ever" had complained to the Corporate Personnel Office in Missouri (and thus lacked a basis for such a perception). (Id., Ex. A at 116.)

During subsequent examination by his own attorney, Plaintiff testified that, in the meetings he had described, "[his] supervisors [were] in the room when the racial comments were made . . . [and] participated in making some of the racial comments[.]" (Id., Ex. A at 129-30.) Plaintiff further averred that he was "afraid to complain" because his "job was at stake" (i.e., that he might "lose [his] job"). (Id., Ex. A at 130.) As grounds for his fear, Plaintiff cited the fact that, on three prior occasions, he "lost [his] job when [he] complained about racism . . . ." (Id.)

At the conclusion of the examination by Plaintiff's counsel, Defendant's counsel "ha[d] some follow-up . . . questions." (Id., Ex. A at 131.) During that questioning, Plaintiff acknowledged that he "testified before that [he] only heard [Vice President] Navarro make one comment four or five years ago and [he] couldn't remember what it was but [he] believe[d] it was racial[.]" (Id.) When asked if that was "still the only thing that [he] c[ould] remember [Navarro] saying," Plaintiff responded: "He always made

comments about – racist comment." (Id.)  Plaintiff then added that Navarro "made only one joke, but he would make a comment out of texture."  (Id.)  In response to a request for clarification, Plaintiff stated:  "Out of texture; out of the ordinary, he would just make a comment about what a black man do [sic]."  (Id.)

Defendant's counsel then solicited "any specifics about what [Navarro] may have said," and Plaintiff replied:  "He would say something like – that black motherfucker always messing up [sic]." (Id., Ex. A at 131-32.)  As to why he failed to mention that matter during his earlier testimony, Plaintiff said:  "Because I just – it just popped up on me.  You ask [sic] me the question.  It come [sic] back to me.  All I was thinking about was what was in the meeting."  (Id., Ex. A at 132.)  Next, Defendant's counsel asked "[h]ow many times did [Plaintiff] hear [Vice President] Navarro make a comment like [Plaintiff] just described?"  (Id.)  Plaintiff answered:  "I guess that was only once too.  That's why it didn't come back for too long."  (Id.)  According to Plaintiff, Navarro made that lone remark "a few years ago," "[a]bout the same time as the one joke [Plaintiff] thought [Navarro] made but couldn't remember specifics[.]"  (Id.)

In addition, during follow-up questioning by Defendant's counsel, Plaintiff acknowledged that the "three times [he was fired for making] claims of racism . . . all [occurred] in the mid 80's" (prior to his promotion to Production Supervisor) and that Plant Manager Campbell and Vice President Navarro "were not around when these times . . . occurred in the 1980's[.]"  (Id., Ex. A at 132-

-9-

33.)  On those occasions, Plaintiff did not complain to Defendant's Corporate Personnel Office, but instead "went to the Plant Manager" and "got [his] job back."  (Id., Ex. A at 133.)

The only other form of harassment Plaintiff cited during his deposition concerned his sense that he "was always being blamed for everything.  And to a white employee, female supervisors, [he] was always wrong.  [He] was always the wrong one." (Docket Entry 21, Ex. A at 82.)  Plaintiff identified two examples:

A)  "[He] had to walk the furthest of anyone [to plant meetings], but [he] was always accused of being late, because [he] ha[d] to stop, make sure the department [wa]s running before [he] even [went] to that meeting.  But if [he] stop[ped] and got a minute late, it seemed like [he] was prosecuted for it."  (Id.);

B)  "If [there were] orders to get out . . .[, Plaintiff] had to explain when [his department was] going to get these orders out. . . .  But if the other supervisors don't do what they're supposed to do and [Plaintiff] d[id]n't get [the orders] out, then [he was] the one blamed."  (Id., Ex. A at 83.)

### Plaintiff's Altercation with Sawyer and Plaintiff's Firing

In connection with his duties as a Production Supervisor, Plaintiff supervised Sawyer, whom he had known since before 1980. (Id., Ex. A at 101, 104.)  According to Human Resources Manager Clark, as a Production Supervisor, Plaintiff was "fully involved in the hiring and employment process."  (Id., Ex. D at 3.)  Clark "specifically recall[ed] having discussions with Plaintiff when Sawyer was hired by [Defendant] in 2001.  Plaintiff wondered if

Sawyer was physically fit enough to perform the work, but said nothing about Sawyer's character, potential criminal background, or fitness for the job." (Id.) Moreover, Clark averred that "Plaintiff was responsible for filling out Sawyer's performance reviews and never made any negative comments about Sawyer – Sawyer was placed into the role of 'Pusher' by Plaintiff, which is a role generally reserved for more reliable employees." (Id.) "Between the date [Defendant] hired Sawyer . . . and March 20, 2008, the only reported performance and/or disciplinary issues involving Sawyer were a few instances of absenteeism." (Id., Ex. D at 4.)[11]

On March 20, 2008, Plaintiff "got into an altercation at work" with Sawyer. (Id., Ex. A at 50-52.) The conflict began when Plaintiff directed Sawyer to get to work. (Id., Ex. A at 51-53.) Sawyer acted as if he intended to throw his coffee at Plaintiff and objected to Plaintiff "tell[ing] [him] to go back to work in front of [other] employees." (Id., Ex. A at 53.) Upon coming in closer contact with Sawyer, Plaintiff "smelled alcohol on him." (Id., Ex. A at 54.) When Plaintiff drew even nearer, he saw that Sawyer was "distant" and discerned that Sawyer was "not hisself (sic)." (Id., Ex. A at 55 (parenthetical in original).)[12]

---

[11] Plaintiff has not contradicted Clark's account on these points, but has clarified that he "had no authority to hire or fire an employee" and that, after Sawyer's hiring, he and Clark "discussed the fact that Sawyer had a criminal background." (Docket Entry 26 at 2.) Plaintiff, however, presented no evidence he advocated Sawyer's dismissal. (See Docket Entry 21, Ex. A; Docket Entry 26.)

[12] On prior occasions, Plaintiff had detected the smell of alcohol on Sawyer's breath, but had neither seen Sawyer drunk on the job nor confirmed that Sawyer drank while working. (Docket Entry 21, Ex. A at 102-03.)

At that point, Plaintiff told Sawyer that he "need[ed] to go home." (Id.) Sawyer responded that he was "going to kick [Plaintiff's] A-S-S." (Id.) Plaintiff then told Sawyer that, because Sawyer was "threatening [Plaintiff]," Sawyer was "going to be fired." (Id.)[13] When Plaintiff "walked away," Sawyer went "over to [Plaintiff's] office and st[oo]d there for a few minutes . . . [while Plaintiff] work[ed] with [other employees]." (Id.) Sawyer thereafter "call[ed] [Plaintiff] back and t[old] [Plaintiff that,] if [Plaintiff was] going to fire [Sawyer, then Plaintiff could] scan [Plaintiff's] card [to clock Sawyer out]." (Id.)

By that time, Plaintiff "kn[e]w [Sawyer was] intoxicated . . . [and was] just going to scan [Sawyer's] card and send him home." (Id.) When Plaintiff turned his back "to scan [Sawyer's] card, [Sawyer] hit[] [Plaintiff] in the jaw. [Plaintiff] mov[ed] away. [Sawyer] hit[] [Plaintiff] in the jaw again." (Id., Ex. A at 56.) Plaintiff was "trying to get away from [Sawyer]. And [he was] in a daze because [Sawyer] hit [him]." (Id.) While Plaintiff was "constantly backing away in a daze[,] . . . [Sawyer was] chasing [Plaintiff] down, swinging at [Plaintiff]." (Id.)[14]

_____

[13] Sawyer previously had "threatened [Plaintiff] once." (Docket Entry 21, Ex. A at 99.) On that occasion, after Plaintiff admonished Sawyer about the frequency of calls coming into the plant from Sawyer's girlfriend, Sawyer "told [Plaintiff] that if a call come [sic] in there and [Sawyer] didn't get it, that [Sawyer] was going to whoop [Plaintiff's] ass." (Id., Ex. A at 100.) Plaintiff did not report that matter to anyone, because Plant Manager Campbell "allowed [Plaintiff] to handle situations mostly on [his] own" and "[i]t was a situation [Plaintiff] felt [he] could handle." (Id., Ex. A at 100-01.)

[14] According to Plaintiff, he "backed away about 20, 30 yards." (Docket Entry 21, Ex. A at 56.)

The "first chance [Plaintiff] got, [he] pushed [Sawyer] against the locker, and [he] hit [Sawyer] a few times to stop [Sawyer] from hurting [him] . . . ." (Id.)[15] Another employee then "held [Sawyer] off, and [Plaintiff] moved on to the office." (Id.) Plaintiff was "real angry, 'cause [he had] been hit in the jaw. [His] hands [we]re hurting." (Id.) Chris Pompey (an employee at the facility and Plaintiff's cousin) "escorted [Sawyer] out the door," although Sawyer did not go "willingly" and "kept trying to come at [Plaintiff]." (Id., Ex. A at 16, 56-57.)

Plaintiff then "went through the plant; through the department; made sure everybody was there; was working. And [he] went and called [Plant Manager Campbell]." (Id., Ex. A at 58.) During that conversation, Plaintiff recounted the foregoing events and Campbell "said that's all right. I'm with you. Everything is okay. He said I'll handle it." (Id.) On Campbell's advice, Plaintiff went to a doctor to have his jaw and hands examined. (Id.) When Plaintiff returned to work later that same day, Campbell said he (Campbell) had "to talk to [Vice President Navarro]" and "advised [Plaintiff] . . . [to] take charges out [against Sawyer]." (Id., Ex. A at 58-60.)[16] Before leaving the facility, Plaintiff "went around and got statements [about his

---

[15] Plaintiff "didn't count" how many times he hit Sawyer, but acknowledged that, as a result of blows he (Plaintiff) delivered, Sawyer began bleeding from a cut over his (Sawyer's) eye. (Docket Entry 21, Ex. A at 56-57.)

[16] Plaintiff did file charges against Sawyer and a judge in Davidson County found Sawyer guilty after a 40-minute trial in which both Plaintiff and Sawyer testified. (Docket Entry 21, Ex. A at 42-44.)

altercation with Sawyer] . . . [from] Edward Smith, Anna McCandies, Sheneda Love, [and] Alfredo Flores." (<u>Id.</u>, Ex. A at 60.)

A short time later, Campbell informed Plaintiff by telephone of his placement on suspension. (<u>Id.</u>, Ex. A at 64.) Within a few days, Plaintiff received a call to come in to the plant; when he did, Navarro, Campbell, and another employee were "waiting on [him]." (<u>Id.</u>, Ex. A at 65-66.) After informing Plaintiff of his firing, Navarro stated that he "did some investigation" into Plaintiff's altercation with Sawyer and concluded that Plaintiff "was too vicious in [his] approach." (<u>Id.</u>, Ex. A at 66.)[17] Plaintiff denied that he "was too vicious," asserted that he "didn't have time to think," and stated that "[a]ll [he] did was react." (<u>Id.</u>) Navarro, however, remained unswayed: "[H]e said after talking to these people that he decided to let [Plaintiff] go. . . . [H]e told [Plaintiff] he had d[one] his investigation and Corporate said to let [Plaintiff] go." (<u>Id.</u>, Ex. A at 67-68.)

Plaintiff reported no knowledge as to what information Navarro gathered before deciding to fire Plaintiff. (<u>Id.</u>, Ex. A at 90.) Navarro, Campbell, and Human Resources Manager Clark, however, all averred that they interviewed witnesses to the altercation. (<u>Id.</u>, Ex. B at 4, Ex. C at 3, Ex. D at 2.)[18] According to all three of

_____

[17] Initially, Plaintiff did not identify which of Defendant's representatives informed him of his firing and the rationale behind it, but later clarified that only Navarro spoke to him. (Docket Entry 21, Ex. A at 70.)

[18] In fact, Navarro stated that, between them, "[t]his group interviewed everyone who might have information regarding the fight, including Plaintiff." (Docket Entry 21, Ex. B at 4-5.)

those affiants, "[a] number" of those witnesses said that, although Sawyer "started the fight, Plaintiff's reaction went well beyond what was necessary to end or to minimize the altercation." (Id., Ex. B at 5, Ex. C at 3, Ex. D at 2-3.) Moreover, in their affidavits, Navarro, Campbell, and Clark each declared that "[w]itnesses reported being shocked at the severity of Plaintiff's reaction." (Id., Ex. B at 5, Ex. C at 3, Ex. D at 3.)

Navarro attested that he "believed these reports, as the witnesses seemed credible and had no reason to speak falsely about what had occurred[, and that he] . . . relied upon these reports in making his decisions about Sawyer's and Plaintiff's employment." (Id., Ex. B at 5.) In addition, Navarro's sworn statement reflected that he consulted with Campbell and Clark, as well as "a Human Resources professional with [Defendant's] corporate human resources department in Missouri. All agreed that the reported facts warranted that both Sawyer's and Plaintiff's employment be terminated." (Id., Ex. B at 5-6.) According to his affidavit, Navarro ultimately decided to fire Sawyer "because he started the fight" and Plaintiff "because of [his] severe overreaction and reported behavior during the fight." (Id., Ex. B at 6.)

## DISCUSSION

### Summary Judgment Standard

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, the Court "may not make

credibility determinations or weigh the evidence." <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000). Instead, it "must consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from the facts in the non-movant's favor." <u>Matvia v. Bald Head Island Mgt., Inc.</u>, 259 F.3d 261, 266 (4th Cir. 2001).

"[T]here is no burden upon 'the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact.' Rather, 'the burden on the moving party may be discharged by "showing" – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'" <u>Carr v. Deeds</u>, 453 F.3d 593, 608 (4th Cir. 2006) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986)) (internal emphasis omitted). Conversely, "[t]he party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but 'must come forward with specific facts showing that there is a genuine issue for trial.'" <u>Emmett v. Johnson</u>, 532 F.3d 291, 297 (4th Cir. 2008) (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)). <u>See also</u> <u>Francis v. Booz, Allen & Hamilton, Inc.</u>, 452 F.3d 299, 308 (4th Cir. 2006) ("Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law.").

<u>Racially Hostile Work Environment in</u>
<u>Violation of Title VII and Section 1981</u>

According to the Complaint, Defendant "subject[ed] [Plaintiff] to . . . [a] hostile work environment . . . in violation of Title VII . . . and [Section] 1981." (Docket Entry 1 at 6.) To make out such a claim,[19] Plaintiff must present evidence of a "'workplace permeated with discriminatory [e.g., race-based] <u>intimidation,</u> <u>ridicule, and insult</u> that is sufficiently <u>severe or pervasive</u> to alter the conditions of the victim's employment and create an abusive working environment.'" <u>Jordan v. Alternative Res. Corp.</u>, 458 F.3d 332, 339 (4th Cir. 2006) (quoting <u>Harris v. Forklift Sys.,</u> <u>Inc.</u>, 510 U.S. 17, 21 (1993) (emphasis added)). "'[S]imple teasing, <u>off-hand comments</u>, and <u>isolated incidents</u> (unless <u>extremely serious</u>) will not amount to discriminatory changes in the terms and conditions of employment.'" <u>Id.</u> (quoting <u>Faragher v.</u> <u>City of Boca Raton</u>, 524 U.S. 775, 788 (1998) (emphasis added)). The evidence adduced by Plaintiff (detailed in the Factual Background section, <u>supra</u>, pp. 4-10) would not allow a reasonable fact-finder to conclude that he suffered race-based "intimidation, ridicule, and insult that [wa]s sufficiently severe or pervasive to alter the conditions of [his] employment," <u>Jordan</u>, 458 F.3d at 339 (internal quotation marks omitted).

Viewed in the light most favorable to Plaintiff, the record reflects the following events deemed harassment by Plaintiff:

---

[19] "The elements [of a hostile work environment claim] are the same under either § 1981 or Title VII." <u>Spriggs v. Diamond Auto Glass</u>, 242 F.3d 179, 184 (4th Cir. 2001).

A) a co-worker's two references to Plaintiff as a "boy" in or around August 2007, one made in a "joking" manner and the other not (see Docket Entry 21, Ex. A at 76-79);

B) the use of the term "black bastards" in a "joking manner" by two of Plaintiff's co-workers, while they were "drinking" with Plaintiff, during a "supervisors' trip" away from the plant in March or April 2007 (see id., Ex. A at 80-81);

C) between three and six "black jokes" (as to which Plaintiff could provide no details) told by Plaintiff's co-workers during meetings at the plant in 2007 (see id., Ex. A at 83-84, 86-88);

D) one remark by Vice President Navarro in 2004 or 2005 similar in nature to the "black jokes" told by Plaintiff's co-workers during meetings in 2007, but which Plaintiff otherwise could not recall (see id., Ex. A at 94-95);

E) a comment by Vice President Navarro "something like – that black motherfucker always messing up [sic]" on one occasion in 2004 or 2005 (see id., Ex. A at 131-32); and

F) an unspecified number of instances over an undefined time period in which Plaintiff "was prosecuted" for being late to meetings when he felt he had valid reasons for such tardiness and in which Plaintiff was "blamed" for delays in the completion of work orders despite the fact that inaction by other supervisors played a part in the slowdown (see id., Ex. A at 82-83).

The last of these categories of harassment bears no discernible connection to race apart from the fact that Plaintiff is black and the persons above him in the company hierarchy (Vice

President Navarro and Plant Manager Campbell), who were in a position to "prosecute" him for coming to meetings late and to "blame" him for production delays, apparently were of another race. The United States Court of Appeals for the Fourth Circuit has held that complaints of this sort (i.e., objections by an employee from one demographic group to the supervision practices of someone from a different demographic group) fail to support a hostile work environment claim. See Hawkins v. Pepsico, Inc., 203 F.3d 274, 281-82 (4th Cir. 2000) (affirming summary judgment for employer on race-based hostile work environment claim, where African-American plaintiff's "complaints about [white supervisor's] management style toward her [we]re without a hint of racial significance" and stating that the "difficulties that [the plaintiff] encountered with [her supervisor] arise routinely in employment relationships . . . [and that the] [l]aw does not blindly ascribe to race all personal conflicts between individuals of different races").

As a result, Plaintiff's hostile work environment claim depends upon the eight to 11 above-cited jokes and remarks to which he was exposed from 2004 until his firing in March 2008. Plaintiff has provided no information about the three to six "black jokes" told by his co-workers during meetings in 2007 and the one similar utterance made by Vice President Navarro in 2004 or 2005; he thus has not presented evidence from which a reasonable fact-finder could decide that those incidents involved race-based "'intimidation, ridicule, and insult,'" Jordan, 458 F.3d at 339 (quoting Harris, 510 U.S. at 21). Conversely, a reference to an

adult black male as a "boy" clearly can constitute a racial insult. See Ash v. Tyson Foods, Inc., 546 U.S. 454, 456 (2006); White v. BFI Waste Servs., LLC, 375 F.3d 288, 297 (4th Cir. 2004). For purposes of evaluating the instant Motion, the undersigned Magistrate Judge also assumes that Plaintiff's co-workers' use of the phrase "black bastards" (even in a "joking manner" in a social situation) and a reference by Vice President Navarro to a third-party as a "black motherfucker" each would qualify as racially insulting language to a reasonable person in Plaintiff's situation.

However, those four occurrences individually fail to satisfy the "severity" requirement for a hostile work environment claim, because none rise to a level that one reasonably could deem "'extremely serious,'" Jordan, 458 F.3d at 339 (quoting Faragher, 524 U.S. at 788). See, e.g., Perry v. Harvey, 332 Fed. Appx. 728, 732 (3d Cir. 2009) (rejecting position that supervisor's "'boy' comment was severe enough to violate Title VII by itself" and noting that "'mere utterance of an [ethnic or racial] epithet which engenders offensive feelings in a [sic] employee does not sufficiently affect the conditions of employment to implicate Title VII'" (quoting Harris, 510 U.S. at 21) (brackets in original)); Cavalier v. Clearlake Rehab. Hosp., Inc., 306 Fed. Appx. 104, 107 (5th Cir. 2009) ("[T]hree of these instances can reasonably be tied to Cavalier's race: the 'beat the tar off of him' comment and two occasions when Simpson called Cavalier 'boy.' . . . [T]hese three instances do not rise to the level of severity . . . required to show a hostile work environment . . . ."); Washington v. Kroger

Co., 218 Fed. Appx. 822, 821 (11th Cir. 2007) (ruling that co-worker's "comments [calling plaintiff 'boy'], though demeaning, were not severe or extreme"); Smith v. Northeastern Ill. Univ., 388 F.3d 559, 566 (7th Cir. 2004) ("[W]hat [Plaintiff] Weaver did actually hear Leenheer say - calling [Plaintiffs] Smith and Reeves 'black motherfuckers' - was only on one occasion over her multiple years as an employee of Northeastern. Referring to colleagues with such terms is hardly admirable, and is in fact deplorable. However, the mere utterance of an epithet which engenders offensive feelings in an employee is not sufficient to establish a hostile work environment." (internal ellipses and some internal quotation marks omitted)); Cephas v. Pepsi Bottling Grp., Inc., No. Civ. WMN-04-2269, 2005 WL 5168264, at *3 (D. Md. Dec. 6, 2005) (unpublished) (ruling that co-worker's occasional references to plaintiff as "black bastard" did "not rise to the level of severe" harassment), aff'd, 177 Fed. Appx. 310 (4th Cir. 2006).

Moreover, given the sporadic nature of Plaintiff's exposure to these offensive utterances (i.e., once in 2004 or 2005, once in March or April 2007, and twice in or around August 2007), said remarks (when taken together) fall short of establishing a hostile work environment claim because they constitute "off-hand comments" and "isolated incidents," not "pervasive" harassment, Jordan, 458 F.3d at 339 (internal quotation marks omitted). See, e.g., Cavalier, 306 Fed. Appx. at 107 ("[T]hree of these instances can reasonably be tied to [the plaintiff's] race: the 'beat the tar off of him' comment and two occasions when Simpson called [him]

-21-

'boy.' . . . [T]hese three instances do not rise to the level of
. . . pervasiveness required to show a hostile work environment
. . . ."); McCann v. Tillman, 526 F.3d 1370, 1378-79 (11th Cir.
2008) ("[T]he only racially insensitive comments [the plaintiff]
heard between 2003 and 2005 were when Bounds called her 'girl' and
called two male black employees 'boys.' . . . Although offensive,
such instances of racially derogatory language alone, extending
over a period of more than two years, are too sporadic and isolated
to establish that her employers' conduct was so objectively . . .
pervasive as to alter the terms and conditions of her
employment."); Elmahdi v. Marriott Hotel Servs., Inc., 339 F.3d
645, 653 (8th Cir. 2003) ("[The plaintiff] was called 'boy' and
'black boy' on a few occasions over a period of years, and Evano
once referred to Africans as having big penises.  While offensive,
the statements do not constitute a steady barrage of opprobrious
racial comment sufficient to support a § 1981 hostile work claim."
(internal footnote and some quotation marks omitted)); Cephas, 2005
WL 5168264, at *3 (holding that co-worker's occasional references
to plaintiff as "black bastard" did "not rise to the level of
. . . pervasive" harassment).

Alternatively, Plaintiff's instant claim fails as a matter of
law because of the absence of "some basis for imposing liability on
[Defendant]," Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184 (4th
Cir. 2001) (internal quotation marks omitted).  In this regard, the
record conclusively establishes that Defendant had a clear policy
that prohibited race-based harassment and provided a number of

methods of redress for employees aggrieved by such conduct; moreover, Plaintiff had full knowledge of such matters. (Docket Entry 21, Ex. A at 44-46, 115-16, and Dep. Ex. 3.) Plaintiff, however, only complained on one occasion about one thing, a co-worker's reference to him as "boy." (Id., Ex. A at 76, 81-84, 115-16.) In that instance, the record confirms that Defendant's policy worked; Plaintiff has admitted that his supervisor reacted with shock to his report, the offending co-worker apologized, and the offensive behavior never recurred. (Id., Ex. A at 76-77.)

Further, Plaintiff cannot avoid the consequences of his failure to utilize Defendant's reporting procedures as to the other incidents to which he now objects simply because his superior, Vice President Navarro, made two of the offending statements and his co-workers told at least some of the "racial jokes" in the presence of either Navarro or Plant Manager Campbell. Defendant's policy allowed Plaintiff to go around the management team at his plant and to present his concerns to Defendant's home-office in Missouri, but Plaintiff failed to do so. (See id., Ex. A at 115-16, Dep. Ex. 3.)

Under these circumstances, even if the involvement of Plaintiff's supervisors in alleged instances of race-based harassment shifts the burden of proof on this issue to Defendant, see Spriggs, 242 F.3d at 186 & n.9 (discussing Faragher, 524 U.S. at 807, and Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998)), the Court should grant summary judgment for Defendant because the record reflects, as a matter of law, that: "(1) it exercised reasonable care to prevent and correct promptly any

harassing behavior; and (2) the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise," id. (internal quotation marks omitted).  See Lissau v. Southern Food Serv., Inc., 159 F.3d 177, 182 (4th Cir. 1998) ("Under the [Faragher/Ellerth] defense, evidence that [the defendant] had disseminated an effective anti-harassment policy provides compelling proof of its efforts to prevent workplace harassment. And any evidence that [the plaintiff] failed to utilize [the defendant's] complaint procedure will normally suffice to satisfy its burden under the second element of the defense." (internal citations and quotation marks omitted)).[20]

---

[20] Plaintiff has failed to cite any authority to support the view that he could forego complaining to Defendant's home-office based on his unsupported belief that nothing would happen or based on his purported fear of retaliation (predicated on alleged retaliatory acts committed decades earlier under different management and which Defendant remedied at the time).  Further, to the extent Plaintiff argues Defendant cannot benefit from the Faragher/Ellerth defense because he ultimately suffered a "tangible employment action" in that he was fired (see Docket Entry 22 at 12), that argument lacks merit; for reasons set forth in the next subsection, infra, pp. 25-30, Plaintiff has not presented sufficient evidence that his firing occurred for discriminatory reasons and thus Defendant may rely on the Faragher/Ellerth defense.  See Lissau, 159 F.3d at 182 ("Tangible employment actions, if not taken for discriminatory reasons, do not vitiate the [Faragher/Ellerth] defense.  If [the plaintiff's] termination did not result from a refusal to submit to [unlawful] harassment, then [the defendant] may advance [the Faragher/Ellerth] defense.").  Finally, Plaintiff cites Faragher, 524 U.S. at 807, for the proposition that an "employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate authority over the employee." (Docket Entry 22 at 10 (emphasis added).)  From that proposition, Plaintiff argues that he should prevail because "Swing was a supervisor for [D]efendant" and "she referred to [him] as a 'boy' during work hours." (Id.)  Assuming Plaintiff has deduced a sound principle from Faragher, his argument nonetheless fails for at least two reasons.  First, as set forth above, supra, pp. 19-22, the use of the term "boy" on two occasions does not create an "actionable hostile environment."  Second, Swing did not have "immediate authority over" Plaintiff.

Accordingly, the Court should enter summary judgment in Defendant's favor on Plaintiff's Title VII and Section 1981 claims for race discrimination in the form of a hostile work environment.

<u>Race-Based Firing in Violation of Title VII,
Section 1981, and North Carolina state law</u>

To establish a claim of race discrimination related to a specific employment decision, a plaintiff may proceed "in one of two ways. First, he may present direct evidence of his superiors' discriminatory intent. Second, he may attempt to satisfy the test specified in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973), which allows him to raise an inference of discriminatory intent by showing that he was treated worse than similarly situated employees of other races." <u>Sterling v. Tenet</u>, 416 F.3d 338, 345 (2005) (internal parallel citations omitted).[21]

Plaintiff does not argue that the record contains sufficient direct evidence of racial discrimination related to his firing to survive summary judgment, but instead contends the case should proceed to a jury pursuant to <u>McDonnell Douglas</u>. (<u>See</u> Docket Entry 22 at 9, 13-14.) Under that approach, "a plaintiff first must make out a prima facie case of discrimination." <u>Merritt v. Old Dominion</u>

---

[21] "[T]he framework of proof for disparate treatment claims - that is, whether the employer intentionally discriminated against the employee - is the same for actions brought under Title VII, or § 1981, or both statutes." <u>Mallory v. Booth Refrigeration Supply Co., Inc.</u>, 882 F.2d 908, 910 (4th Cir. 1989). Moreover, "[g]iven the similar language and underlying policy of [N.C. Gen. Stat.] § 143-422.2 and Title VII . . ., the North Carolina Supreme Court has explicitly adopted the Title VII evidentiary standards in evaluating a state claim under § 143-422.2 insofar as they do not conflict with North Carolina statutes and case law." <u>Hughes v. Bedsole</u>, 48 F.3d 1376, 1383 (4th Cir. 1995). Plaintiff does not assert any such conflicts exist. (Docket Entry 22 at 12-13.)

Freight Line, Inc., 601 F.3d 289, 294 (4th Cir. 2010). In this context, "the elements of a prima facie case . . . are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." Coleman v. Maryland Ct. of App., 626 F.3d 187, 190 (4th Cir. 2010).

Plaintiff's race discrimination claim premised on his firing fails on the "similarly situated" prong. To meet that element, "[P]laintiffs are required to show that they are similar in all relevant respects to their comparator . . . [, including that they] 'engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" Haywood v. Locke, 387 Fed. Appx. 355, 359 (4th Cir. 2010) (citing and quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992))). Accord Heyward v. Monroe, No. 97-2430, 166 F.3d 332 (decision without opinion), 1998 WL 841494, at *2 (4th Cir. Dec. 7, 1998) (unpublished); Odom v. International Paper Co., 652 F. Supp. 2d 671, 688 (E.D. Va. 2009), aff'd, 381 Fed. Appx. 246 (4th Cir. 2010); Holtz v. Jefferson Smurfit Corp., 408 F. Supp. 2d 193, 206 (M.D.N.C. 2006), aff'd, 242 Fed. Appx. 75 (4th Cir. 2007).

In an attempt to make such a showing, Plaintiff asserts in his response brief (without citation) that "[D]efendant admits that a white male employee, Bill Cruse, was not terminated under the same or similar circumstances." (Docket Entry 22 at 13.) In fact, however, in its summary judgment brief, Defendant expressly argued

that "Cruse's situation was very different, even as reported by Plaintiff." (Docket Entry 21 at 10.) Plaintiff's deposition testimony supports Defendant's position: "[Cruse] was coming down the aisle. [An] employee [who] didn't like [Cruse] . . . jumped out and hit [Cruse], knock[ing] [Cruse] over [a] rail. [Cruse] was fighting back . . . [and] landed [some blows], but he was falling at the time. . . . [T]he other employee kind of g[o]t the better of [the altercation.]" (Id., Ex. A at 66-67.)

Cruse's landing of defensive blows while falling down does not bear sufficient similarity to the circumstances that Vice President Navarro found (based on witness reports) in this case, i.e., that Plaintiff used excessive force in repelling Sawyer's assault. Plaintiff thus has not shown that he and Cruse were similarly situated, because "[a]n employer is entitled to use ferocity as a criterion for distinguishing between workplace fights." Rogers v. Wisconsin Knife Works, Inc., No. 00-C-135-C, 2000 WL 34227963, at *9 (W.D. Wis. Oct. 30, 2000) (unpublished). See also Kendrick v. Commission of Zoological Subdist., 565 F.2d 524, 527 (8th Cir. 1977) (finding that prior incident in which employer-defendant failed to fire white employee who landed "one mild blow" during altercation with co-worker provided no support for black employee-plaintiff's discrimination claim in connection with his firing for "beat[ing]" co-worker); Fuller v. Decatur Pub. Sch. Bd. of Educ. Sch. Dist. 61, 78 F. Supp. 2d 812, 825 (C.D. Ill. 2000) (rejecting plaintiff's "similarly situated" argument because fights that resulted in different punishments differed in "magnitude").

Further, the record reflects that Vice President Navarro played no part in any decision to retain Cruse; indeed, the altercation involving Cruse occurred before Navarro even came to work at the plant. (Id., Ex. A at 66.) Plaintiff has given no reason for the Court to ignore this material distinction between his and Cruse's situations. (See Docket Entry 22 at 13.)

The Fourth Circuit has held that, under such circumstances, a plaintiff fails to satisfy the "similarly situated" requirement:

> [The plaintiff] identified only one employee who had been involved in a physical altercation and held a comparable supervisory position. However, at the time of that incident, the circumstances of which were less than clear, the offending employee had a different supervisor than [the plaintiff]. If different decision-makers are involved, employees are generally not similarly situated. Accordingly, because a different supervisor was involved in the incident that [the plaintiff] compares to his own, and [the plaintiff] failed to provide any evidence that would allow for an adequate comparison between the two decision-makers, we find the different outcomes of the two incidents unpersuasive. . . . Therefore, we find that the district court did not err in granting judgment as a matter of law in favor of [the defendant].

Forrest v. Transit Mgmt. of Charlotte, Inc., 245 Fed. Appx. 255, 257 (4th Cir. 2007) (internal citations omitted) (emphasis added). See also Flateau v. South Carolina Comm'n for the Blind, 50 Fed. Appx. 653, 655 (4th Cir. 2002) ("[The plaintiff] points to . . . two male employees who received supplemental salary increases for assumption of additional responsibilities. However, there is no indication that [the supervisor who denied the female-plaintiff-employee such an increase] had anything to do with [the two male employees'] salary increases. . . . These facts fail to establish an inference of unlawful discrimination."); Heyward, 1998 WL

841494, at *2 ("If different decision makers are involved, employees are generally not similarly situated."); <u>Anglin v. Progress Energy Serv. Co.</u>, 645 F. Supp. 2d 519, 526 (E.D.N.C. 2009) ("Although plaintiff [who is African-American] vaguely asserts that [white employees were] treated differently because of their race, plaintiff has provided no evidence that [any such white employees] were similarly situated to plaintiff in terms of the . . . identity of the decision makers."); <u>McDougal-Wilson v. Goodyear Tire and Rubber Co.</u>, 427 F. Supp. 2d 595, 610 (E.D.N.C. 2006) ("To be similarly situated the employees must have been disciplined by the same supervisor."); <u>Holtz</u>, 408 F. Supp. 2d at 206 ("[To] show that he is similarly situated [to a comparator] . . ., the employee must generally show the same decisionmaker made the disparate employment decisions."); <u>Grey v. Potter</u>, No. 1:00CV964, 2003 WL 1923733, at *12 (M.D.N.C. Apr. 21, 2003) (unpublished) ("[B]ecause there is no indication that [the comparator] was promoted by the same supervisor who denied Plaintiff's promotion, such evidence is insufficient to support Plaintiff's claim that similarly situated employees were treated differently.").[22]

---

[22] Additionally, "as a general rule, . . . plaintiffs [who allege discriminatory firing] must show that they were replaced by someone outside their protected class in order to make out a prima facie case." <u>Miles v. Dell, Inc.</u>, 429 F.3d 480, 486 (4th Cir. 2005). Notwithstanding Plaintiff's conclusory allegations (<u>see</u> Docket Entry 22 at 3), the competent record evidence reflects that Defendant filled the Production Supervisor position vacancy that resulted from Plaintiff's firing by promoting an African-American employee (and that Defendant did so before Plaintiff filed his Charge of Discrimination with the Equal Employment Opportunity Commission). (<u>See</u> Docket Entry 21, Ex. A at 21-22, Ex. B at 7, Dep. Ex. 7; Docket Entry 32 at 2-3.)

In sum, Plaintiff has not presented sufficient evidence to make out a prima facie case of race discrimination in relation to Defendant's decision to fire him. The Court therefore should enter summary judgment for Defendant on such claims whether brought under Title VII, Section 1981, or North Carolina state law.

<u>Negligent Supervision and Retention</u>
<u>in Violation of North Carolina State Law</u>

According to Plaintiff's Complaint, Defendant "is liable to [him] for the Negligent Supervision and Retention of Sawyer." (Docket Entry 1 at 6.) In this regard, the Complaint alleges that, on March 20, 2008, "Sawyer was inebriated at work and physically assaulted . . . Plaintiff[, who along with] other employees of [Defendant] had previously complained to [Defendant's management] that Sawyer was coming to work intoxicated and was acting aggressively towards [Plaintiff] and other employees. In addition, Sawyer had a prior criminal background which [Defendant] knew or should have known of." (<u>Id.</u> at 3.)

North Carolina law does recognize that employers may have liability for "assault[s] [committed] by an employee of [an] establishment whom the proprietor knew, or in the exercise of reasonable care in the selection and supervision of his employees should have known, to be likely, by reason of past conduct, bad temper, or otherwise, to commit an assault . . . ." <u>Wegner v. Delly-Land Delicatessen, Inc.</u>, 270 N.C. 62, 65 (1967). "This basis for imposing liability upon the proprietor for an assault by his

employee is, however, the negligence of the proprietor himself, in the selection or supervision of his employee." Id.

In this case, as detailed in the Factual Background section, supra, pp. 10-12, the evidence adduced by Plaintiff does not bear out the Complaint's allegations in a manner that would allow a reasonable fact-finder to impose such liability upon Defendant. First, Plaintiff's deposition testimony confirms that he did not inform Defendant's higher management "that Sawyer was coming to work intoxicated and was acting aggressively towards [Plaintiff]" (Docket Entry 1 at 3); rather, as of March 20, 2008, Plaintiff never had seen Sawyer drunk on the job and Plaintiff had failed to report the one occasion when Sawyer threatened him. (See Docket Entry 21, Ex. A at 99-103.) Further, Plaintiff never placed any negative comments in the performance reviews he completed on Sawyer and Plaintiff assigned Sawyer duties "generally reserved for more reliable employees." (Id., Ex. D at 3.) Moreover, the record reflects that, prior to March 20, 2008, Defendant had notice of only one documented problem that had arisen during Sawyer's time as an employee, "a few instances of absenteeism." (Id., Ex. D at 4.)

Plaintiff did aver that, during Sawyer's employment, he talked with Human Resources Manager Clark about the fact that Sawyer "had a criminal background." (Docket Entry 26 at 2.) However, in neither his deposition, nor his affidavit did Plaintiff assert that he ever suggested Defendant should discharge Sawyer or should subject Sawyer to some special form of supervision due to Sawyer's "criminal background" (or for any other reason). Further,

-31-

Plaintiff has failed to come forward with any evidence that Sawyer's "criminal background" would permit a reasonable fact-finder to conclude that Defendant had a duty to take special precautions or to fire Sawyer because he posed an unreasonable risk to his co-workers.[23]

Under these circumstances, Plaintiff's North Carolina state law claim for negligent supervision and retention fails as a matter of law and the Court therefore should enter summary judgment in Defendant's favor on said claim.[24]

## CONCLUSION

For the foregoing reasons, as to Plaintiff's Title VII, Section 1981, and/or North Carolina state law claims for racial discrimination in the form of a racially-hostile work environment and due to discharge from employment because of race, as well as

---

[23] Even if the print-outs from Courtsearch.com about Sawyer submitted by Plaintiff represented admissible evidence (which they likely do not), they show only that Sawyer had the following convictions as of March 20, 2008: 1) possession of lottery tickets, committed on June 4, 1995 (Docket Entry 26-1 at 1); 2) resisting a public officer, committed on June 4, 1995 (id. at 5); and 3) assault on a female, committed on March 13, 1988 (Docket Entry 26-2 at 6). Only the last of these offenses has – as an element – the use or threatened use of force. Moreover, the Courtsearch.com records show nothing about Sawyer's conduct underlying his convictions; accordingly, they provide no basis to infer that Sawyer posed a particular risk of violence in the workplace. As Defendant points out in its reply brief (Docket Entry 31 at 5), allowing Plaintiff's negligent supervision and retention claim to proceed under these facts effectively would authorize a jury to declare that an employer may not employ persons who at any time in their lives sustained a conviction for any offense that involved the use or threatened use of force. Plaintiff has cited no precedent for that view and the Court should decline to construe North Carolina law in such a fashion.

[24] Because Plaintiff has tendered insufficient evidence to sustain a negligent supervision and retention claim under North Carolina law, the Court need not address Defendant's alternative argument that "the exclusive remedy provisions of the [North Carolina Workers' Compensation] Act bar his negligence claim" (Docket Entry 21 at 16).

Plaintiff's North Carolina state law claim for negligent supervision and retention, Defendant has shown "'that there is an absence of evidence to support [Plaintiff's] case.'" <u>Carr</u>, 453 F.3d at 608 (quoting <u>Celotex Corp.</u>, 477 U.S. at 325).

**IT IS THEREFORE RECOMMENDED** that Defendant's Motion for Summary Judgment (Docket Entry 20) be **GRANTED.**

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

January 24, 2011